IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| ROBERT HAYNES, | CIV S-08-2177-SPG (PC) |
| Plaintiff, | |
| vs. | ORDER ON SUMMARY JUDGMENT |
| D.K. SISTO, T. SEQUIRA, V. SINGH, J. TILTON, | |
| Defendants. | |

      The court hereby GRANTS in part and DENIES in part Defendants' motion for summary judgment.

      This is a civil rights action under 42 U.S.C. § 1983.  In 2007, the administration at California State Prison - Solano ("Solano") placed all African-American inmates in one facility at the prison on "modified program," or "lockdown," in response to race-related violence between African-American and Southern Hispanic inmates.  Plaintiff Robert Haynes, who was among the prisoners placed on lockdown, alleges that Defendants' actions violated the Equal Protection Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

      Defendants have moved for summary judgment.  For the reasons set forth below, the motion will be granted in part and denied in part.

**I.**    **Background**

- 1 -

The following facts are undisputed, except as otherwise noted.

Plaintiff Robert Haynes is an African-American inmate incarcerated in Facility I at Solano.  Doc. 111 ¶¶ 1-3.

At the times relevant to this action, Defendants were all state officials in the California prison system.  Id. ¶¶ 4-7.  Defendant D.K. Sisto was the Warden at Solano, Defendant T. Sequira was the Associate Warden, and Defendant V. Singh was the Facility Captain of Facility I. Id. ¶¶ 5-7.  Defendant J. Tilton was the Secretary of the California Department of Corrections and Rehabilitation.  Id. ¶ 8.

Violence among inmates is a "fact of prison life" at Solano, where the inmate population includes violent felons and convicted murderers.  Id. ¶ 8.  Some inmates are members of violent gangs that form along racial lines, and often, but not always, violence at the prison is race- or ethnicity-based.  Id. ¶¶ 15, 16; Doc. 73.6 ¶ 7; Doc. 73.7 ¶ 3.

Prison officials try, but are unable, to anticipate and prevent every violent act committed by inmates.  Doc. 111 ¶ 10.  When a violent incident does occur, prison personnel first act to end the disturbance and to provide any necessary medical treatment.  Id. ¶ 11.  They then notify the prison administrators, including the Warden, Associate Warden, and the affected Facility Captains.  Doc. 73.6 ¶ 4.  The prison officials then begin an investigation of the incident, seeking first to determine which groups of inmates might have been involved in the incident.  Id. ¶¶ 4-5.

When the prison officials determine that a particular group of inmates has been involved in violence, they place that group on "modified program," which is also known as "lockdown" or "partial lockdown."  Doc. 73.4 at 34; Doc. 73.5 ¶ 4; Doc. 73.6 ¶ 5.  Inmates who are on lockdown are not allowed to leave their cells without a guard escort, which may require two or more officers per inmate.  Doc. 111 ¶ 30; Doc. 73.7 ¶ 5.  Enforcement of lockdown strains prison resources, especially if prison officials decide that, because of racial aspects of the violence, they must separate inmate groups that are normally programmed together.  Doc. 111 ¶¶ 31, 33; Doc. 73.7 ¶ 5.  Normal prison support services, such as educational programs; prison jobs; religious services; visitation; and group mental health therapy, are restricted or unavailable when a modified program is in place.  Doc. 111 ¶ 32.  A modified program may continue for a prolonged period if the

administration's investigation suggests that, without such measures, continued violence is likely. Id. ¶ 27.

If the prison administration determines, after considering the races of the involved inmates and the historical relations among various inmate groups, that an incident implicates rival prison gangs or specific ethnic groups, those gangs or ethnic groups may be placed on modified program. Doc. 73.5 ¶ 5; Doc. 73.6 ¶ 7. As a result, when violence appears to result from racial tensions, the entire inmate population of a particular race may be locked down unless the investigation determines that the risk of violence is limited to a portion of those inmates—for example, those inmates who are members of a particular gang. Doc. 73.6 ¶ 7.

During the year that preceded the events that gave rise to this action, a series of violent incidents occurred among the Southern Hispanic and African-American inmates at Solano. In June 2006, two African-American inmates from Facility I attacked a Southern Hispanic inmate from Facility II. Doc. 111 ¶ 37. As a result, all Southern Hispanic and African-American inmates in Facilities I and II were placed on modified program. Id. ¶ 38. About one week later, the Southern Hispanic inmates were released to normal programming. Id. ¶ 39. Somewhat more than a week after that, the prison administration began to release—in phases, according to "identified case factors"—the African-American inmates. Id. ¶ 40. Six days later, a group of thirty-three Southern Hispanic inmates attacked a group of African-American inmates in Facility I. Id. ¶ 41. As a result, all Southern Hispanic inmates in Facility I, as well as those housed with them, were placed on modified program. Id. ¶ 42. Between December 2006 and June 2007, there were at least three more incidents of violence between Southern Hispanic and African-American inmates; in each case, a period of modified programming was imposed on the inmates associated with the attacks. Id. ¶ 43; Doc. 73.5 ¶¶ 15-60.

Some Southern Hispanic inmates remained on modified program almost continuously during the nearly year-long period of violence. Doc. 111 ¶ 48. Starting on May 23, 2007, it appears that the administration also put all African-American inmates in Facility I on modified program in response to the refusal of certain of those inmates to meet with Southern Hispanic inmates to discuss the peaceful reintegration of those populations. Doc. 73.5 ¶ 39.

Beginning on June 8, 2007, the prison administrators at Solano began an effort to

reintegrate the Southern Hispanic inmates into normal programming with the African-American inmates. Doc. 111 ¶ 46. On June 13, an African-American inmate assaulted a Southern Hispanic inmate in the dayroom of Building 2. Doc. 73.5 ¶ 57. The administration responded by immediately placing all African-American inmates in Building 2 on modified program. Id. ¶ 58. The next day, it appears that the population of inmates subject to modified program was expanded to include all African-Americans in Facility I. Id. ¶ 59. On June 15, three of those inmates, who had been released from their cell after claiming to need the attention of medical staff in the building, attacked a Southern Hispanic inmate. Doc. 111 ¶ 49; Doc. 73.5 ¶ 60. As a result, all African-American inmates in Facility I were kept on modified program, and the administration took additional measures to ensure that they had no contact with the Southern Hispanic inmates. Doc. 73.5 ¶ 60.[1]

Defendant Singh, who was the Associate Warden of Solano at the time, described the decision to put all African-American inmates in Facility I on modified program as follows:

> When, on June 15, 2007, three Black inmates assaulted one Southern Hispanic porter, prison administrators . . . decided to place the Black inmates on modified program while returning the Southern Hispanic inmates to normal programming. This decision was made because . . . the Southern Hispanic inmate population had repeatedly expressed and demonstrated its willingness to reintegrate and program with the Black inmates without violence, whereas the Black inmates had repeatedly expressed and demonstrated their resistance to reintegration. The June 15, 2007, assault demonstrated the Black inmate population's unwillingness to program without violence. Accordingly, the decision was made that since the Black inmates were being the aggressors, they would be placed on modified program while the Southern Hispanic inmates returned to normal programming.
>
> I, along with the other prison administrators, decided to place the entire Black inmate population on modified program because we were unable to narrow the class of involved Black inmates into gang or other faction, i.e., Bloods, Crips, Kumis, etc. Based upon all of the information we had, it appeared that the tension between the Southern Hispanics and Black inmates appeared to include all Black inmates. Thus, while the tension was a faction of Hispanic inmates on one side, i.e., Southern Hispanics, it appeared to be an entire race on the other, i.e., the whole Black inmate

---

[1] It is not clear from the record whether the African-American inmates who had been on modified program starting on May 23 had remained so between then and the events of June 15. Doc. 73.5 ¶¶ 12-60. Indeed, the parties dispute the length of the modified program that is the subject of this action. Defendants assert that Plaintiff was on lockdown beginning on June 15, whereas Plaintiff maintains that the program began earlier, on May 23. Doc. 111 ¶ 50. The parties agree that it was in effect at least until October 9, 2007. Id. ¶ 71. Construing the facts in Plaintiff's favor for purposes of summary judgment, the court will assume that Plaintiff was on modified program continuously from May 23 until October 9.

```
       population on Facility I.  It was for this reason that we decided to place the entire
       Black inmate population on modified program.
```

Doc. 73.6 ¶¶ 13-14.

The prison kept the African-American inmates of Facility I in the modified program for some time. On August 1, one of the inmates requested an interview with Defendant Sequira to discuss the program. Doc. 111 ¶ 61. That inmate told Sequira that most of the African-American inmates in Facility I were not interested in retaliating against the Southern Hispanics. Id. ¶ 62. Sequira asked for three other inmates who could fairly represent all African-American inmates in Facility I. Id. ¶ 63. When those individuals were identified, they emphasized to Sequira that most of the affected inmates wanted only to return to normal programming and were willing to enter discussions with Southern Hispanic inmates regarding their reintegration into the prison yard. Id. ¶ 65. Over the course of August and September, prison administrators began relaxing some of the conditions of the modified program imposed on the African-American inmates of Facility I. Id. ¶¶ 67-68. Beginning on October 9 and continuing through the end of the month, prison officials released the inmates to normal program in stages. Id. ¶¶ 72-82. Thus, the entire African-American inmate population in Facility I was in modified program for about four-and-a-half months. Id. ¶ 83.

Plaintiff was among the inmates who were attacked by Southern Hispanic inmates during at least one of the violent incidents between African-American and Southern Hispanic inmates in 2006 and 2007. Id. ¶ 90. There is no evidence, however, that suggests that he was ever an aggressor. Moreover, the parties agree that he is "unaffiliated," which means that he is not a member or associate of any of the gangs or other disruptive groups involved with such violence at the prison. Id. ¶ 1. He does, however, know inmates who are affiliated with disruptive groups. Id. ¶ 2.

Plaintiff was also among the African-American inmates who were placed on modified program during the summer and early fall of 2007. Id. ¶ 88. Although he does not appear to have suffered serious medical ailments as a result of the modified program, his doctors did suggest that some headaches he suffered were the result of heat and poor air ventilation in his cell. Doc. 73.4 at 47. In addition, he was unable to engage in outdoor exercise while on modified program, and he testified that he experienced a modest loss of strength in his upper body during that time. Id. at 31-

32, 48.

Plaintiff subsequently commenced this action. The amended complaint alleges that the prison administrators violated the Equal Protection, Due Process, and Cruel and Unusual Punishment Clauses of the Eighth and Fourteenth Amendments by putting him on modified program on account of his race and by depriving him of outdoor exercise for the duration of the modified program. Screening the complaint pursuant to 28 U.S.C. § 1915A(a), this court dismissed Plaintiff's due process claim. It recognized, however, that the complaint stated claims under the Equal Protection Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment. After discovery, Defendants moved for summary judgment as to the remaining claims.

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must resolve any conflicts by viewing all facts and reasonable inferences in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). A non-moving party may not, however, simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–57 (1986).

"A defendant who moves for summary judgment bears the initial burden of proving the absence of any triable issue of fact but need not produce evidence negating elements of a claim for which the plaintiff bears the burden of proof at trial." Estate of Tucker ex rel. Tucker v. Interscope Records, 515 F.3d 1019, 1029 (9th Cir. 2008) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323–25 (1986)). A non-moving plaintiff will defeat a motion for summary judgment by establishing a genuine dispute of material fact—that is, by producing evidence "'such that a reasonable jury could return a verdict'" in his favor. Id. at 1029–30 (quoting Anderson, 477 U.S. at 248).

## III. Analysis

Defendants assert the defense of qualified immunity with respect to both of Plaintiff's

claims. Qualified immunity protects government officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Such immunity ensures that public officials may be held "accountable when they exercise power irresponsibly," while "shield[ing]" them "from harassment, distraction, and liability when they perform their duties reasonably." Id.

        Whether a government officer is entitled to qualified immunity rests on the answer to two questions: (1) "whether the officer violated a plaintiff's constitutional right" and (2) if there was a violation, "whether the constitutional right was clearly established in light of the specific context of the case at the time of the events in question." Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (internal quotation marks omitted), certs. denied, 132 S. Ct. 2681, 2682, and 2684 (2012); see also Saucier v. Katz, 533 U.S. 194, 201 (2001) (setting forth two-step test), overruled in part by Pearson, 555 U.S. at 236. The court has discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. Pearson, 555 U.S. at 236.

        Here, the court will address the existence of a constitutional violation first. In general, a sequential application of each prong of the qualified immunity test "promotes the development of constitutional precedent." Id. Moreover, because qualified immunity does not bar injunctive relief in actions under § 1983, id., addressing the merits of Plaintiff's claims would be necessary to resolve his request for an injunction against future racially-defined lockdowns, even if qualified immunity shielded defendants from liability for damages.[2]

---

[2] The modified program that Plaintiff challenges ended in October 2007. Nevertheless, his claim is not moot because the alleged imposition of modified program on account of racial classifications is an action that is capable of repetition while evading review. See C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist., 654 F.3d 975, 983 (9th Cir. 2011) (explaining that injunctive relief may be available against such actions in "extraordinary cases in which (1) the duration of the challenged action is too short to be fully litigated before it ceases, and (2) there is a reasonable expectation that the plaintiff will be subjected to the same action again" (internal quotation marks and alteration omitted)), cert. denied, 132 S. Ct. 1566 (2012). Of course, Plaintiff's release from Solano would dispel any expectation that he will be subjected to the same action again. See Alvarez v. Hill, 667 F.3d 1061, 1064 (9th Cir. 2012) ("'An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action.'" (quoting Dilley
(continued...)

### A.     **Equal Protection Claim**

The Fourteenth Amendment's command that no state shall "deny to any person . . . the equal protection of the laws . . . is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (internal quotation marks omitted). Thus, Plaintiff must show that Defendants "acted with an intent or purpose to discriminate against [him] based upon membership in a protected class." Thornton v. City of St. Helens, 425 F.3d 1158, 1166 (9th Cir. 2005) (internal quotation marks omitted). Once a plaintiff demonstrates that he was intentionally treated differently from others similarly situated, the standard for judicial review of the challenged action is determined by the nature of the classification. Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995). Actions by prison officials that rest on racial classifications must be reviewed under strict scrutiny. Johnson v. California, 543 U.S. 499, 502 (2005). Under that standard, the government has the burden of proving that the racial classifications "are narrowly tailored measures that further compelling governmental interests." Id. at 505 (internal quotation marks omitted).

Here, the undisputed evidence shows that prison administrators at Solano repeatedly placed entire racial groups on modified program because of the acts of individual inmates within those racial groups. On June 14, 2006, after two African-American inmates from Facility I attacked one Southern Hispanic inmate from Facility II, the African-American population in Facility I was placed on modified program. Doc. 73.5 ¶ 8. On July 6, 2006, after thirty-three Southern Hispanic inmates attacked a group of African-American inmates, "all Southern Hispanic inmates . . . were placed on modified program." Id. ¶ 11. On October 16, 2006, after a white inmate who was a member of a disruptive group attacked a Southern Hispanic inmate, "all white inmates were placed on a modified program." Id. ¶ 12. On December 21, 2006, an attack by four Southern Hispanic

---

(...continued)
v. Gunn, 64 F.3d 1365, 1368 (9th Cir. 1995))). But because Plaintiff has not, to the court's knowledge, been released, and because the alleged constitutional violations appear to fall within the "capable of repetition, yet evading review" exception, the court will not dismiss Plaintiff's claims for injunctive relief as moot at this time.

inmates against four African-Americans resulted in modified program for the Southern Hispanic population. Id. ¶ 15.[3] On May 23, 2007, the entire African-American population was placed on modified program because of the unwillingness of certain representatives of the African-American community to engage in reintegration meetings with Southern Hispanic representatives. Id. at 28-29. On June 13, 2007, after a single African-American inmate assaulted a Southern Hispanic inmate in Building 2, all African-American inmates in that building were again put on modified program (even though, it appears, they may never have been returned to normal programming). Id. at 57-58. Two days later, when three African-American inmates who had been released from their cell because of their purported need to visit a doctor attacked a Southern Hispanic inmate, the administration imposed additional measures on the modified program that applied to all African-American inmates. Id. ¶ 60. This series of events clearly shows a pattern of responding to violent acts of <u>individual</u> inmates by imposing modified program on <u>all other</u> prisoners of the same race.

It is not necessary to decide whether this pattern of conduct constituted an affirmative policy of racial segregation because Defendants acknowledge that, in the case of the lockdown that was imposed on African-American inmates between May 23 and October 9, 2007, which is the subject of this action, they intentionally employed a racial classification. In the words of Defendant Singh, prison officials

> decided to place the entire Black inmate population on modified program because [they] were unable to narrow the class of involved Black inmates into gang or other faction, i.e., Bloods, Crips, Kumis, etc. . . . [I]t appeared that the tension between the Southern Hispanics and Black inmates appeared to include all Black inmates. . . . It was for this reason that we decided to place the entire Black inmate population on modified program.

Doc. 73.6 ¶¶ 13-14. For purposes of deciding the applicable level of scrutiny in an equal protection challenge, it is irrelevant that the challenged action took place in the context of a prison, or that Defendants may have employed the racial classification out of practical necessity or for the legitimate purpose of ensuring safety. See Johnson, 543 U.S. at 505, 512 (holding that strict scrutiny

---

[3] It is unclear whether the administration placed all Southern Hispanic inmates, or only the four aggressors, on modified program following the December 2006 incident. For purposes of summary judgment, however, the court interprets that ambiguity in the light most favorable to Plaintiff: that is, to suggest that Defendants imposed the lockdown on all inmates of that race.

applies in review of prison policy of segregating new prisoners by race for safety reasons because "[w]e have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications"); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 226–27 (1995) ("[A]ll racial classifications [imposed by government] must be analyzed by a reviewing court under strict scrutiny."). Because Plaintiff, an unaffiliated inmate who did not engage in any acts of violence, was placed on lockdown because of his membership in a class consisting of African-American inmates in Facility I, strict scrutiny applies.[4]

Accordingly, Defendants may succeed on summary judgment only if the undisputed evidence shows that the decision to put Plaintiff on modified program was a "narrowly tailored measure[] that further[ed] compelling governmental interests." Johnson, 543 U.S. at 505 (internal quotation marks omitted). Of course, prison security is a compelling governmental interest. Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir. 2008) (citing Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)). The evidence unequivocally shows that the challenged actions were directed toward alleviating racially-motivated violence between African-American and Southern Hispanic inmates. Doc. 73.6 ¶ 7. It is accordingly beyond dispute that the challenged actions were directed toward the compelling interest of promoting prison security.

Plaintiffs argue, however, that the prison administration's actions were not narrowly tailored to that interest. Narrow tailoring requires that "the means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." Grutter v. Bollinger, 539 U.S. 306, 333 (2003) (internal quotation marks and first alteration omitted) (alteration in original). No per se rule governs whether a prison's policy of temporary racial segregation is narrowly tailored to security purposes; rather, narrow tailoring must be assessed case by case. See Johnson, 543 U.S. at 514 ("Strict scrutiny does not preclude the ability

---

[4] Defendants argue that Plaintiff was not treated differently than other similarly situated inmates because "inmates of all ethnicities were at various times placed on modified program at least in part because of their ethnicity." Doc. 73.1 at 11. The relevant question is not whether other racial or ethnic groups have also been subjected to discriminatory polices at Solano at some time, but whether the official actions being challenged here included a decision to place Plaintiff on lockdown because of his race, while other unaffiliated, non-violent inmates were not so treated at that time.

of prison officials to address the compelling interest in prison safety.  Prison administrators, however, will have to demonstrate that any race-based policies are narrowly tailored to that end.").  At the same time, the Supreme Court has suggested that actions by prison officials that discriminate because of racial identity alone can be justified only by "a social emergency rising to the level of imminent danger to life and limb—for example, a prison race riot, requiring temporary segregation of inmates."  Id. at 512–13 (internal quotation marks omitted).

The United States Court of Appeals for the Ninth Circuit's decision in Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010), is informative.  In Richardson, as in this case, the plaintiff was an African-American inmate in a state prison that appeared to suffer from severe racial violence.  Id. at 668–69.  He sued the prison administrators, alleging that they had violated his right to equal protection by repeatedly placing him, along with the entire African-American inmate population in one facility, on lockdown following certain incidents of violence by a subset of those inmates.  Id. at 669–70.  There, as here, the plaintiff was not himself affiliated with any of the disruptive groups.  Id. at 670.  The district court granted summary judgment to the defendants, ruling that no constitutional violation had occurred.  Id. at 668, 671.  The Ninth Circuit reversed, stating that the defendants "made no evidentiary showing at all concerning the basis for regarding all African-Americans as a security risk when one or a few African-American inmates are responsible for an assault." Id. at 671–72.  Although the defendants did not assert a qualified immunity defense, the panel added that,

> even under [a] weaker standard, which may govern the qualified immunity question, the assertion that it was sufficient for prison officials simply to believe there to be a link between an individual incident perpetrated by one or two inmates, and the risk of violence from all the African-American prisoners . . . , falls short.

Id. at 671.

Likewise, summary judgment is not warranted here.  Defendants have not adequately shown that prisoners' race correlated with the security risk so closely that use of a broad racial classification was justifiable.  The relevant testimony on this issue consists of Defendant Singh's assertions (1) that "the Black inmates had repeatedly expressed and demonstrated their resistance to reintegration," (2) that "[t]he June 15, 2007, assault demonstrated the Black inmate population's unwillingness to program without violence," (3) "that the tension between the Southern Hispanics and Black inmates appeared to include all Black inmates," and (4) that prison administrators "were

unable to narrow the class of involved Black inmates into gang or other faction, i.e., Bloods, Crips, Kumis, etc." Doc. 73.6 ¶¶ 13-14.  Making all inferences in Plaintiff's favor, however, the Court cannot say that those conclusions are undisputably supported by the record.  It is true that isolated incidents of violence at Solano in 2006 and 2007 were perpetrated by African-American inmates, but those inmates comprised only a small subset of the total African-American population in Facility I. Doc. 73.5 ¶¶ 8, 28-19, 57-58, 60.  Testimony that prison officials concluded from such incidents that all African-American inmates posed a security risk is precisely the kind of generalization that the Ninth Circuit, in Richardson, found insufficient to demonstrate narrow tailoring—at least at the summary-judgment stage.  594 F.3d at 671.  Plaintiff is unaffiliated with any gang or disruptive group at the prison and, it appears, has never instigated a violent incident there.  Doc. 111 ¶ 1; Doc. 73.6 ¶ 90.  Apart from his race, he therefore has more in common with those prisoners who were not subjected to modified program than he does with the perpetrators of the violent incidents at issue. The finder of fact may ultimately credit Defendant Singh's assertion that prison officials could not form any narrower classification of inmates that posed a security risk than race.  But the court cannot say, at this time, that every reasonable finder of fact would do so.

        Nor may Defendants claim qualified immunity, at least at this stage.  In 2005, the Supreme Court made clear that, in the context of prison security, racial classifications receive strict scrutiny.  Johnson, 543 U.S. at 502.  The series of violent incidents and racially-defined modified programs at Solano occurred later, in 2006 and 2007.  Thus, the law at the time of the events in question unambiguously required Defendants to use such measures only if they are narrowly tailored to the purpose of promoting prison security.  Qualified immunity will protect Defendants from liability if the evidence ultimately shows that their factual judgment that they were unable to limit the lockdown measure to a narrower class of potentially violent inmates was reasonable.  See Mattos, 661 F.3d at 440 (noting that qualified immunity will protect an official from liability for a reasonable mistake of fact, as well as a mistake of law).  But because the reasonableness of that judgment depends on factual issues that are disputed, summary judgment is not appropriate.  See Santos v. Gates, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (holding that summary judgment as to qualified immunity is "premature" if determining whether an official made a reasonable mistake of fact or law

"may depend on the jury's resolution of disputed facts and the inferences it draws therefrom.").

Finally, Defendant Tilton asserts that all claims against him must be dismissed because, as the Secretary of the California Department of Corrections and Rehabilitation, he had no personal involvement with the actions that Plaintiff challenges. A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted), cert. denied, 132 S. Ct. 2101 (2012). But to prove a claim for supervisory liability, it is necessary to show that the supervisor acted with the same state of mind that must be shown to prove a direct violation. Id. at 1206 (citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009)); see also Dodds v. Richardson, 614 F.3d 1185, 1204 (10th Cir. 2010) ("[A]fter Iqbal, Plaintiff can no longer succeed on a § 1983 claim against Defendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation he alleges." (internal quotation marks omitted)). Here, Plaintiff cannot meet that burden because the evidence shows neither that Defendant Tilton had any awareness of the specific actions at issue nor that he directly supervised the individuals alleged to have directly caused the constitutional violation. Plaintiff merely points out that Defendant Titlton was in charge of the state's prison program at the time of the alleged violations. Doc. 111 ¶ 4. Without evidence that Tilton acted with a discriminatory purpose, or that he was at least aware of discriminatory practices among his subordinates, Plaintiff cannot maintain a claim against him.

Accordingly, as to Plaintiff's equal protection claim, summary judgment will be granted in favor of Defendant Tilton but denied with respect to Defendants Sisto, Seguira, and Singh.

**B.**     **Eighth Amendment Claim**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment" under the "evolving standards of decency" that "currently prevail." Atkins v. Virginia, 536 U.S. 304, 311 (2002) (internal quotation marks omitted). This prohibition clearly encompasses punishments that are "inherently barbaric" or "disproportionate to the crime," Graham v. Florida, 130 S. Ct. 2011,

2021 (2010), as well as conditions of confinement that impose "unnecessary and wanton infliction of pain," such as deprivation of vital medical care, Estelle v. Gamble, 429 U.S. 97, 102–05 (1976) (internal quotation marks omitted).  An Eighth Amendment claim that rests on allegedly inadequate conditions of confinement requires the court to engage in both an objective and a subjective inquiry. Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Objectively, the plaintiff must show that the deprivation is "sufficiently serious" to "result in the denial of the minimal civilized measure of life's necessities." Id. (internal quotation marks omitted).  With respect to the subjective requirement, the plaintiff must show, at the very least, that the defendant "kn[ew] that inmates face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." Id. at 847.

Plaintiff asserts that the prolonged modified program during the summer of 2007 was an unconstitutional condition of confinement because he was deprived of any opportunity for outdoor exercise during that period.  He relies on a line of cases in which the Ninth Circuit has recognized that prolonged deprivations of outdoor exercise, when combined with other serious deprivations, may give rise to an Eighth Amendment claim.  See Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (holding that the "cumulative impact" of "several factors," including continuous segregation, "meager out-of-cell movements," "minimal" contact with other persons, and an "atmosphere of fear and apprehension" for a period of years rendered some amount of outdoor exercise constitutionally necessary (internal quotation marks omitted)); but see LeMaire v. Maass, 12 F.3d 1444, 1457–58 (9th Cir. 1993) (holding that, although the denial of outdoor exercise may be unconstitutional, such a denial for a period of five years did not violate the Eighth Amendment, where the prisoner was afforded opportunities for indoor exercise).

Here, the alleged deprivation is considerably less than those that the Ninth Circuit has recognized as constitutional violations.  Plaintiff was on modified program from May 23, 2007, until around October 9, 2007.  That period of somewhat more than four months is substantially shorter than the period at issue in Spain.  Apart from establishing a lack of exercise, the evidence does not show that conditions in Plaintiff's cell during the modified program were harmful, although it does appear that his cell was poorly ventilated and hot.  Doc. 73.4 at 47.  It is doubtful that these

conditions, even construed in the light most favorable to Plaintiff, rose to the level of objectively cruel and unusual punishment under the Eighth Amendment.

It is not necessary to decide that objective question, however, because Plaintiff's claim fails on the subjective prong of the analysis. Summary judgment against a plaintiff on an Eighth Amendment claim may be granted for failure to satisfy the Eighth Amendment's subjective requirement where there is no dispute of fact as to whether the defendants acted with malice or deliberate indifference. See Farmer, 511 U.S. at 834. District courts have granted summary judgment for failure to meet the subjective requirement in cases in which the evidence shows merely that prison authorities imposed the denial of exercise as part of a modified program responding to particularized security risks. See Hayes v. Garcia, 461 F. Supp. 2d 1198, 1207–08 (S.D. Cal. 2006) (granting summary judgment to the defendants where the prison's program restrictions "were designed and continually modified in an effort to stop [the] racially-motivated violence" (internal quotation marks omitted) (alteration in original)); Hurd v. Garcia, 454 F. Supp. 2d 1032, 1045 (S.D. Cal. 2006) (granting summary judgment to the defendants because "the uncontroverted evidence establishe[d] that the suspension of outdoor exercise was a reasonable and necessary response to ongoing racial violence" at a prison and not the result of deliberate indifference to inmate health or safety); Jones v. Garcia, 430 F. Supp. 2d 1095, 1102–03 (S.D. Cal. 2006) (granting summary judgment to the defendants as to a prisoner's Eighth Amendment claim where the "evidence establishe[d] that Plaintiff's outdoor exercise was suspended only after racial tensions erupted into violence"). Here, as in those cases, the evidence shows that Plaintiff was placed on modified program as a response to specific incidents of violence to reduce the risk of further violence. Doc. 73.5 ¶ 7. Without evidence that Defendants acted out of malice or deliberate indifference, Plaintiff cannot satisfy the subjection requirement of an Eighth Amendment claim.

Even if Plaintiff's conditions of confinement during the period of modified program could constitute an Eighth Amendment violation, Defendants would be protected from liability at the second step of the Saucier analysis. At the time of the events at issue, it was not clear under existing legal authority whether the constitution prohibited the actions taken by the Solano prison officials. The cases on which Plaintiff relies, in which the Ninth Circuit has recognized that prolonged

deprivations of outdoor exercise may give rise to constitutional violations, concerned only <u>longer</u> periods of deprivation that were combined with <u>other</u> harsh lockdown conditions.  See Spain, 600 F.2d at 199 (holding that the "cumulative impact" of "several factors," including a denial of outdoor exercise, for a period of <u>years</u> could amount to a constitutional violation); LeMaire, 12 F.3d at 1457–58 (holding that five-year deprivation of outdoor exercise did not violate the Eighth Amendment, where the prisoner was afforded opportunities for indoor exercise).  Defendants are entitled to qualified immunity because, given those precedents, they could reasonably have concluded that the conditions they imposed as part of Plaintiff's modified program did not violate any constitutional right that was "clearly established in light of the specific context of the case at the time of the events in question." Mattos, 661 F.3d at 440 (internal quotation marks omitted).

Accordingly, summary judgment will be granted in favor of Defendants as to Plaintiff's Eighth Amendment claim.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is:

1. GRANTED as to all claims against Defendant Tilton;
2. GRANTED as to the Eighth Amendment claim against Defendants Sisto, Sequira, and Singh; and
3. DENIED as to the remaining claims.

IT IS SO ORDERED.

Dated:  November 30, 2012


                                                    /s/ Susan P. Graber
_____ UNITED STATES CIRCUIT JUDGE